IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Judge

Criminal Case No. 04-cr-00229-LTB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MARK JORDAN,

    Defendant.

_____

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
_____

This case is before me on Defendant Mark Jordan's Motion for a New Trial Based on Newly Discovered Evidence of Actual Innocence [Doc # 658]. Following a four-day evidentiary hearing, the parties' submissions of proposed findings of fact and conclusions of law, oral argument on the motion, and review of the record, I make the following findings of fact and conclusions of law:

## I. Findings of Fact

**A. Defendant's Trial and Conviction for the Murder of David Stone**

1. On June 3, 1999, David Stone died after being stabbed three times while on the recreation yard of the United States Penitentiary in Florence, Colorado ("USP Florence"). *United States v. Jordan,* 485 F.3d 1214, 1216 (10th Cir. 2007). Five years after the stabbing, Jordan was charged with the murder of Stone and three related offenses. *Id.* at 1217.

2. At trial, Gary Collins, an inmate on the yard at USP Florence on the day of the stabbing, testified that he saw Jordan stab Stone in the back and that Jordan was oddly dressed

that day in a khaki shirt and pants despite the heat. *Id.* at 1216. Collins further testified that after the stabbing, Stone took off running, and Jordan ran after him. *Id.*

3. Tyrone Davis, another inmate on the yard at USP Florence on the day of the stabbing, testified at trial that he saw Jordan standing by Stone and pushing or punching Stone in the back side in an underhanded manner. *Id.* Davis further testified that Stone then began running with Jordan giving chase. *Id.*

4. Norvel Meadors, an assistant warden at USP Florence, testified at trial that he observed two prisoners that he could not identify involved in a chase across the recreation yard from an overlooking patio and radioed a compound officer to direct the inmates to cease their actions. *Id.* at 1217. Meadors noticed that the first inmate was wearing shorts and no shirt and the pursuing inmate was wearing a khaki shirt and pants. *Id.* Meadors further testified that the inmate wearing a khaki shirt and pants stopped running but that the inmate in shorts continued running until he eventually collapsed to the ground. *Id.* Meadors observed the inmate wearing a khaki shirt and pants throw an object onto the roof of the housing unit and then sit down at a picnic table. *Id.* Meadors then saw another officer approach this inmate at the picnic table, pat him down, and take him into custody. *Id.*

5. Benjamin Valle, the USP Florence officer who responded to Meadors radio call, testified he observed two inmates running across the recreation yard with about 15 yards between them. *Id.* Valle testified that he saw the pursuing inmate stop, walk back towards a housing unit, throw something up on the roof of the housing unit, and walk over to a bench and sit down. *Id.* Valle searched this inmate and took him into custody. *Id.* This inmate was Jordan. *Id.*

6. A third corrections officer, Fare Finns, Jr., observed the same incidents on the recreation yard in nearly identical detail to Valle. *Id.*

7. A video surveillance camera from the day of Stone's stabbing showed, among other things (1) four inmates, including Jordan and Stone sitting at a concrete bench approximately 11 minutes before the stabbing; (2) Jordan approaching where Stone sat immediately before the stabbing; and (3) the subsequent chase between Stone and Jordan. *Id.*

8. Yet another prison official asked Jordan about a spot of blood on his left arm. *Id.* Jordan attributed the blood to Stone running into him and claimed he was trying to help Stone. *Id.*

9. Prison officials retrieved an 11-12 inch, bloody, homemade knife or shank from the roof of the housing unit. *Id.* Stone's DNA was found on the shank. *Id.* There was additional DNA on the handle of the shank but its origin could not be determined. *Id.* No fingerprints were found on the shank because its handle had been wrapped in cloth. *Id.*

10. Hasham Erzouki, a physician assistant at USP Florence on the day of Stone's stabbing, testified that he examined Jordan that evening in the Special Housing Unit ("SHU"). Erzouki described Jordan as smiling and proud and testified that Jordan made a V sign to another inmate in the area and said, "Guy, I get him out of your way." Trial Transcript ("TT"), pp. 640.

11. Days before Stone's stabbing , Jordan wrote a letter to his mother in which he sated that "... it looks like I'm finally going to have my transfer soon;" that he "would rather be locked in [his] cell not having to deal with the pieces of scum they have [him] in here with;" and that he was "determined" to serve his sentence his way, "alone." TT, pp. 560-2.

12. At trial, Jordan did not dispute that (1) he handled the shank used to stab Stone; (2) that he was the inmate Meadors and Valle saw running across the prison yard; and (3) that he threw the murder weapon on the roof of the housing unit. *Id.* at 1219-20. Jordan denied that he killed Stone and claimed that Sean Riker, another inmate on the prison yard at the time of the stabbing, was the assailant. *Id.* at 1220.

13. Certain evidence that Jordan sought to introduce to show that Riker murdered Stone was excluded from the trial. *Id.* at 1218. This evidence consisted of (1) evidence that Riker possessed a shank nearly identical to the one used to murder Stone six months prior to the murder; (2) evidence that Riker offered false statements to investigators of Stone's murder; (3) evidence that Riker was investigated by prison officials as a possible suspect in Stone's murder; and (4) evidence of a blood-stained glove on the bleachers where Riker and other inmates went after the stabbing. *Id.* at 1220. The exclusion of this evidence was upheld on appeal. *Id.* at 1218 - 1224. Other evidence relating to Riker was admitted at trial, and Jordan's trial counsel raised the possibility that Riker was responsible for Stone's murder. *Id.* at 1220, 1223-4.

14. Evidence of statements that Stone made identifying Jordan as his assailant was also excluded from the trial. Doc #107.

15. On August 9, 2005, a jury convicted Jordan for the murder of Stone and on the three related charges. *Jordan,* 485 F.3d at 1217.

## B. Jordan's Newly Discovered Evidence

16. Jordan's Motion for a New Trial is predicated on two items of newly discovered evidence: (1) Riker's statements in a letter to the trial prosecutor and in a signed declaration that he murdered Stone; and (2) DNA testing arguably linking Riker to the murder weapon.

### 1. Riker's Statements and Testimony

17. In a letter to the trial prosecutor dated October 15, 2012, Riker stated:

I am the person that killed David Stone.
I lied to you for obvious reasons.
I threatened Gary Collins and that bony Negro to testify as they did.
Mark Jordan is innocent. I stabbed David in the back and passed the shank to
Mark.

18. At the time he wrote to the trial prosecutor, Riker was serving a sentence of over 200 years in Wisconsin state prison for abusing his wife, sexually abusing her children, and various

4

other crimes. June 26, 2014 Hearing Transcript ("JHT"), pp. 7, 115; August 7, 2014 Hearing Transcript ("AHT"), pp. 117-18, Ex. 15. Riker acknowledges that he would be better off in federal prison with a murder conviction than in state prison on his current sentence. JHT, pp. 115-6.

19. After his state court conviction but prior to his October 15, 2012 letter, Riker also wrote two letters to Jordan's prior counsel, Donald Bound, Esq. Ex. 101 & 102. In the first letter, Riker stated that Jordan was innocent in the murder of Stone and that he was ready to confess. Ex. 101. But in the second letter, Riker stated that Jordan had killed Stone. Ex. 102. Riker attached what he labelled an "affidavit" to the second letter in which he claimed that Jordan had murdered Stone in a jealous rage after seeing Stone kiss another inmate. *Id.*

20. In November of 2012, Riker sent two letters to Laura Rovner, an attorney and law professor who had represented Jordan in a civil matter. Exs. 104 & 105. In the first letter, Riker stated, "I am trying to set [Jordan] free by claiming responsibility for the crime he is serving life for." Ex. 104. In the second letter, Riker told Ms. Rovner:

> I am trying to set [Jordan] free and trade places w/ him. I want to go to the feds.
>
> I am serving a life sentence for crimes I did not do. Just like [Jordan]. Karma has played a role in my demise because I killed David Stone.

21. Later, in a sworn declaration dated April 11, 2013, Riker stated that he "stabbed and killed David Stone" and that Jordan "who has been convicted of that killing is in fact innocent of it." Ex. 4 at ¶ 1. In the remaining paragraphs of the declaration, Riker provided details of events preceding and following the stabbing. *Id.* at ¶¶ 2-16.

22. Riker's April 11, 2013 declaration was typewritten for his signature by the Reilly Pozner law firm based on four telephone conversations with Reilly Pozner attorneys and staff from January to April 2013. AHT, pp. 54-65. During these calls, Riker consistently said that he,

5

not Jordan, killed Stone, *id.* at p. 57 and agreed to provide a DNA sample to be tested against that found on the murder weapon. *Id.* at pp. 64-5. Per his declaration, Riker believed that his DNA would be found on the weapon. Ex. 4, ¶ 16.

23. Riker's signed declaration that he returned to the Reilly Pozner firm via mail had some previously typewritten words whited out and replaced with handwritten words. Exs. 4, E & 4D; AHT, pp. 69-73. These handwritten edits did not alter the principle fact that Riker was stating that it was he, not Jordan, who stabbed Stone. *Id.*

24. In a fifth and final conversation between Riker and the Reilly Pozner firm on February 20, 2014, the firm advised Riker that he would be called to testify at the evidentiary hearing on Defendant's motion, and Riker affirmed that he would testify consistent with his declaration. AHT, pp. 75-6. Several months prior to the start of the evidentiary hearing in this case, however, Riker notified Jordan's counsel that if he was called to court he would assert his Fifth Amendment rights and not testify. Ex. S. Riker indicated that he was upset with Jordan for "posts" he had made about him on the internet and stated "Here I am taking blame for something I didn't do and [Jordan] fucks it up." *Id.*

25. Notwithstanding the above-referenced correspondence, Riker testified before this Court on June 26, 2014. Riker testified that his October 15, 2012 confession letter to the trial prosecutor was a lie written so he could come to court and prove his innocence. JHT, pp. 47-50. Riker further testified that the handwritten words on his April 11, 2013 declaration were written by someone other than him to change "inane," "totally out-of-context" words he had written in as a "fuck you" to Jordan's counsel. JHT, pp. 32-4. Ellen Ray, who notarized Riker's declaration and is familiar with his handwriting, is "approximately eighty percent sure the handwritten words on the declaration are in inmate Riker's handwriting." Ex. K.

26. In succession then, Riker admitted to, then denied, stabbing Stone on multiple occasions. Even apart from numerous state and federal criminal convictions, I find that Riker has serious credibility problems such that neither his statements admitting to stabbing Stone or his statements denying that he did so are credible.

**2. DNA Testing and Expert Testimony**

27. Dr. Roger Vincent Miller was qualified as a expert and provided expert testimony in the area of forensic DNA analysis. JHT, p. 8.

28. Dr. Miller essentially concurred with prosecution trial witness Dr. LaBerge's findings that the shank used as the murder weapon contained a mixture of DNA with at least two human sources; that the "major source" contributor was victim Stone; and that Jordan could be excluded as a source of the DNA found on the shank. AHT, pp. 10, 12, 25-6.

29. Dr. Miller compared the DNA sample provided by Riker to the "minor source" DNA on the murder weapon and concluded that Riker could not be excluded as the "minor source" contributor. AHT, pp. 9-10, 18-20. In statistical terms, Dr. Miller testified that he would expect to be able to exclude all but one in 2.3 million individuals or "99.999 plus" percent of all Caucasian, Hispanic, and African-American individuals. AHT, pp. 20-2.

30. Evidence that Riker touched the shank independent of Stone's stabbing was presented at Jordan's trial and at the evidentiary hearing (TT, pp. 356, 371-2; JHT, pp. 66-7 & 74; October 8, 2014 Hearing Transcript ("OHT"), pp. 88-9), and Dr. Miller acknowledged that there was no way to determine how any of the DNA came to be on the shank. AHT, pp. 37-9.

31. In affirming my denial of a prior request by Jordan for DNA testing, the Tenth Circuit "fail[ed] to see how the presence of Mr. Riker's DNA on the murder weapon or other items would undermine the strength of the government's case in any meaningful way" but would instead "demonstrate, at most, that Mr. Riker touched or handled those items at some point."

*United States v. Jordan,* 594 F.3d 1265, 1268 (10th Cir. 2010). As the Tenth Circuit explained, "the presence of Riker's DNA on the these items would not 'explain away' the evidence of Mr. Jordan's motive, his curious statements after the crime, the uncontested fact that he chased the murder victim and then discarded the murder weapon, or the eyewitness testimony that Mr. Jordan stabbed Mr. Stone." *Id.*

32. I find that Jordan has established by a preponderance of the evidence that a jury in a new trial in this case would find that Riker's DNA was on the murder weapon. But for the reasons explained by the Tenth Circuit, it does not follow that this evidence is sufficient to create reasonable doubt as to who murdered Stone that did not exist at Jordan's trial.

## C. Other Evidence Presented at the Evidentiary Hearing

### 1. Stone's Statements Following the Stabbing

33. ███████████████████████████████████████████████████████████████████

34. Stone was in serious condition immediately following the stabbing and was fearful that he was dying. OHT, pp. 6, 10-4, 16, 39, 62, 72-5. In the room where he was being treated for his stab wounds, Terry Finnegan, the health services administrator for USP Florence, questioned Stone about what happened as part of a mental status examination. *Id.* at 38-9. Stone told Finnegan that "Mark Jordan stuck me." *Id.* at p. 39

35. During a motions hearing in July of 2005, Johnnie Carr, a special investigative agent for USP Florence, testified that he asked Stone multiple questions about what had happened so he could assess whether the incident would impact the general prison population based on personal relationships of the involved parties. July 8, 2005 Hearing Transcript ("2005 HT"), pp.

22-6. Carr testified that Stone first told him that Jordan stabbed him over money he needed to pay a drug debt while being transported from the recreation yard to the treatment room. *Id.* at pp. 25-6.

36. Carr was in the room where Stone was treated for his stab wounds. OHT, pp. 9, 38, 60. In an interview with the FBI in June of 2014, Carr stated that Stone told him "I don't know why Mark Jordan stabbed/stuck me" while in the treatment room and then proceeded to tell him that it was over drugs and money. Ex. 144. Miguel Medina, a physician's assistant in Stone's treatment room, testified that he heard Carr ask Stone "who did this?" and that Stone responded in part that "it was due to a drug debt." OHT, p. 61. Medina did not hear Stone identify Jordan but testified that Stone whispered something else to Carr. *Id.*

37. Janette Spence, an activities lieutenant at USP Florence, met Stone at the ambulance that took him to the hospital. OHT, pp.164. Spence testified that Carr was also present at the ambulance and was asking Stone who had stabbed him. *Id.* at 165. Spence never heard Stone respond to Carr's questioning. *Id.* at 165-6. Spence was not present in Stone's treatment room. *Id.* at 164.

38. I do not find any significant discrepancy between Carr's hearing testimony and his statement to the FBI or Spence's testimony. Specifically, Carr testified that he was with Stone continuously from the time he first approached him on the recreation yard until Stone was placed in an ambulance that transported him to a local hospital, 2005 HT, p. 23-4, and that he continued to question Stone during the entire time he was with him. *Id.* at 24-6. Carr also testified that Stone repeated the fact that Jordan stabbed him three or four times. *Id.* at 26.

39. I find that evidence that Stone told Carr and Finnegan that Jordan stabbed him is credible. I further find that there is no evidence that Stone had any reason to falsely identify the person who stabbed him.

9

### 2. Rasnick's Testimony

40. On the day of Stone's murder, Rasnick was an inmate at USP Florence and seated at a picnic table on the prison's recreation yard with Stone just before the stabbing. OHT, pp. 82, 96-7.

41. When he testified at the evidentiary hearing on Jordan's motion, Rasnick was facing state charges in Florida for bank robbery. OHT, p. 110. Rasnick agreed to talk to FBI agents in connection with the hearing on Jordan's motion because he thought it could benefit him to face federal charges rather than state charges for these crimes. *Id.* at 110-18.

42. Around the time of Stone's murder, Rasnick testified that Jordan told him he was having problems because he owed money for drugs and that Stone was not paying him money that he owed him. *Id.* at 88-9.

43. Rasnick testified that early in the afternoon on the day of Stone's murder, Jordan told him that he was going to kill Stone on the yard and that he observed Jordan making a shank while Riker kept watch. *Id.* at 89-90. By the time of Stone's stabbing, however, Rasnick testified that he thought the time had passed and that it wasn't going to happen. *Id.* at 89-90, 139, 145-6.

44. Rasnick testified that he was lying back on the picnic table approximately 2-3 feet away from Stone at the time of the stabbing, and that, from a "sideways" view, he saw Jordan approach from behind holding the shank with two hands and stab Stone. *Id.* at 97, 99, 136-7.

45. Following the stabbing, Rasnick testified that Jordan gave chase to Stone and continued to swing the shank at him while Rasnick went in the opposite direction. *Id.* at 137-8.

46. Because Rasnick's testimony is consistent with the prison surveillance video (Ex. 157), I find that it bears some credibility.

### 3. Morrison's Testimony

47. Tayler Morrison, Riker's ex-wife who Riker was convicted of abusing along with her children, credibly testified that Riker told her he had killed a man in prison and gotten away with it. AHT, p. 111. The fact that Riker told this to Mosrrison, however, does make it any more likely to be true given the significant issues with Riker's credibility as set forth above and his apparent motivation to intimidate Morrison.

### 4. Clark's Testimony

48. Walter Clark, a unit manager at USP Florence at the time of Stone's murder, credibly testified that about a month prior to the murder Jordan requested to be housed in a single cell and that he denied his request. OHT, p. 150. Jordan reiterated that he wanted a single cell and said "What do I have to do? Kill a motherfucker to get to the supermax or ADX to get a single cell?" *Id.*

### 5. Jordan's Testimony

49. Jordan did not testify at the original trial but did testify at the evidentiary hearing. As he has throughout the history of this case, Jordan denied stabbing Stone. OHT, pp. 182-92.

50. Jordan testified that Riker's April 11, 2013 declaration was false in many respects. *Id.* at 290-6. This testimony further undermines Riker's credibility with respect to the statements set forth in the declaration.

51. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██ ████████████████████████████████████

11

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

52. Earlier on the day of the stabbing, Jordan testified that Stone told him he thought everything was going to be okay regarding the issues other prisoners had with him. *Id.* at 201.

53. █████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

54. ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

55. ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

56. ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████

57. Jordan admits that Collins was on the prison yard at the time of the stabbing, *id.* at 212, and that Stone owed him a small debt at the time of his murder. *Id.* at 188.

58. ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████

59. ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

60. ███████████████████████████████████████
███████████████████████████████████████████████
██

61. Jordan has about 34 years remaining on his sentence for the murder of Stone. *Id.* at 325. If acquitted after retrial, Jordan would have only around 3 years remaining on his original

sentence for bank robberies.  *Id.*

62.  Primarily because it is inconsistent with other credible evidence in this case, including eyewitness accounts and Stone's statements, I find that Jordan's testimony as to what transpired on June 3, 1999 is not credible.  I also find that the credibility of Jordan's testimony is significantly undermined by the tremendous benefit to him if his murder sentence was vacated at a new trial.

### 6.  BOP After Action Report

63.  In a BOP After Action Report prepared sometime after Stone's stabbing, it is reported that Jordan confessed to the stabbing later that same day.  Ex. 41.  There is no other evidence that Jordan ever confessed to the murder, and I find the statement in the After Action Report that he did so is false.  It does not, follow, however, that any testimony by BOP witnesses is not credible.

## II.  Conclusions of Law

### A.  Legal Standards for Motion for a New Trial

1.  "A motion for a new trial based on newly discovered evidence is not favorably regarded and should be granted only with great caution."  *United States v. McCullough,* 457 F.3d 1150, 1167 (10th Cir. 2006) (*quoting United States v. Combs,* 267 F.3d 1167, 1176 (10th Cir. 2001)).  To prevail on such a motion, a defendant must prove

> (1) the evidence was newly discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Id.* (*quoting United States v. LaVallee,* 439 F.3d 670, 700 (10th Cir. 2006)).  The only dispute regarding Jordan's motion is whether he has proven that his newly discovered evidence would probably result in an acquittal at a new trial.

14

2. "[T]he district court is to serve as a gatekeeper to a new trial, deciding in the first instance, whether the defendant's proffered 'new evidence' is credible." *McCullough*, 439 F.3d at 700. In making this assessment, the district court's focus should be on "whether a jury would probably reach a different result upon hearing the new evidence." *United States v. Kelly,* 539 F.3d 172, 189 (3d Cir. 2008). *See also United States v. Gray Bear,* 116 F.3d 349, 350 (8th Cir. 1997) ("The real question, we suppose, is not whether the district court believed [the proffered testimony] but how likely the district judge thought a jury at a second trial would be to believe it."). Generally though, if a district court does not itself find evidence credible, it is unlikely that the same court would find the evidence persuasive enough to conclude that it would probably produce an acquittal at a new trial. *Kelly,* 539 F.3d at 189 n. 14.

3. In assessing the credibility of newly discovered evidence, "the district court cannot view the proffered evidence in a vacuum." *Id.* Instead, "it must weigh the testimony against all of the other evidence in the record, including the evidence already weighed and considered by the jury in the defendant's first trial." *Id.* Further, the district court's credibility assessment "should take into account all of the evidence that a jury would be likely to hear and consider were the defendant granted a new trial." *Id.* at 190. If the newly discovered evidence is not credible when weighed against all the other evidence, it follows that this evidence probably would not produce an acquittal at a new trial. *United States v. Wilson,* 624 F.3d 640, 663 (4th Cir. 2010).

4. The probability of a jury acquittal must be measured against the reasonable doubt standard. *See United States v. Piazza,* 647 F.3d 559, 570 (5th Cir. 2011) (district court did not err in finding that new evidence would probably produce an acquittal where new evidence "could rise to the level of reasonable doubt" that someone else had committed the crime). "Reasonable doubt" is

15

> ... doubt that a reasonable person would have after weighing all the evidence. It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life. ...
>
> A reasonable doubt is not caprice or whim. It is not speculation or suspicion.

Modern Federal Jury Instructions, Criminal, Vol. 1, Instruction 4.2.

### B. The Admissibility of Stone's Statements Following the Stabbing

5. Although Stone's statements identifying Jordan as his assailant were excluded from the trial, I have since ruled that these statements, properly characterized as dying declarations under Fed. R. Evid. 804(b)(2), would be admissible at a new trial based on changes in the law since that time. Doc #714. None of the evidence or argument presented at the hearing on Jordan's motion undermines this conclusion. I therefore consider these statements in assessing the credibility of Jordan's new evidence. *Kelly, supra.*

### C. Jordan's Newly Discovered Evidence

6. The only newly discovered evidence in this case consists of Riker's confessions to Stone's murder and the DNA testing showing Riker's DNA on the murder weapon. All remaining evidence cannot provide an independent basis to grant Jordan's motion but may be considered in my credibility determination of the newly discovered evidence. *Kelly, supra.*

#### 1. Jordan's DNA Evidence Would Not Probably Produce an Acquittal at a New Trial

7. As previously set forth in my findings of fact, the presence of Riker's DNA on the murder weapon by itself would not probably result in Jordan's acquittal at a new trial for the reasons explained by the Tenth Circuit in *United States v. Jordan,* 594 F.3d 1265, 1268 (10th Cir. 2010). For the same reasons, the presence of Riker's DNA on the murder weapon does nothing to bolster the credibility of Riker's confessions. In particular, it is undisputed that Riker handled the murder weapon at some point in time such that the presence of his DNA on the

shank fails to directly link him to the stabbing of Stone.

### 2. Riker's Confessions Would Not Probably Produce an Acquittal at a New Trial

8. Riker testified at length at the evidentiary hearing on Jordan's motion despite telling Jordan's counsel that he would assert his Fifth Amendment rights and not testify if called as a witness. Given this history, it is unclear if Riker would testify at a new trial for Jordan. Given the vastly conflicting statements he has made throughout the recent history of this case, it is also unclear as what Riker might say on the stand at a new trial.

9. If Riker asserted his Fifth Amendment rights at a new trial, his testimony at the evidentiary hearing would be admissible pursuant to Fed. R. Evid. 804(b)(1) as former testimony given at a hearing and offered against a party that had an opportunity and similar motive to develop it by direct, cross-, or redirect examination. *See also* Fed. R. Evid. 804(a)(1) (declarant is unavailable when granted privilege not to testify). At the evidentiary hearing, Riker testified about all of his confessions to Stone's murder and his recantations of them. *See* OHT.

10. As for Riker's April 11, 2013 declaration, I am not persuaded that it "was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition" so as to be admissibile as non-hearsay under Fed. R. Evid. 801(d)(1)(A). Specifically, "the term 'other proceeding' is not unlimited" and "seems to contemplate situations in which an official verbatim record is routinely kept, whether stenographically or by electronic means, under legal authority." *United State v. Dietrich,* 854 F.2d 1056, 1061 (7th Cir. 1988). Indeed, affidavits similar to Riker's declaration have been deemed inadmissible under Rule 801(d)(1)(A). *See Santos v. Murdoch,* 243 F.3d 681, 684 (2d. Cir. 2001) (witness meeting with attorney and signing affidavit prepared by him did not constitute "other proceeding"); *United States v. Micke,* 859 F.2d 473, 473, 476-7 (7th Cir. 1988) (investigative interviews with IRS agent that generated affidavit were not a "proceeding" for purposes of Rule 801(d)(1)(A)); *(United States v. Livingston,* 661 F.2d

17

239, 242 (D.C. Cir. 1981) (statement written by postal inspector after questioning witness and signed by witness swearing to the accuracy of the statements did not satisfy Rule 801(d)(1)(A)'s requirement of "a trial, hearing, or other proceeding").

11. If Riker asserted his Fifth Amendment rights at a new trial, Riker's April 11, 2013 declaration and other confessions to the murder of Stone would, however, be admissible under Fed. R. Evid. 804(b)(3). Although Riker is serving a sentence of over 200 years in state prison, I nonetheless conclude that a confession to the murder of Stone exposes him to significant criminal liability such that a reasonable person in Riker's position would have only made such incriminating statements if they believed them to be true. Fed. R. Evid. 804(b)(3)(A). Indeed, Riker claims to be innocent of the charges for which he is serving his state sentence and has appealed his conviction. JHT, p. 118; AHT, p.121.

12. Alternatively, Riker's April 13, 2013 declaration would be admissible under the residual exception to the hearsay rule set forth in Fed. R. Evid. 807. The circumstances surrounding the procurement of the declaration whereby Riker had several conversations with Jordan's counsel over a period of months in which his version of events remained consistent satisfy Rule 807(a)(1)'s requirement of "equivalent circumstantial guarantees of trustworthiness" to other exceptions to the hearsay rule. Furthermore, Riker's declaration is material, probative, and would serve the interests of Jordan's defense. *See* Fed. R. Evid. 807(a)(2)-(4).

13. Notwithstanding the admission of Riker's confessions and conflicting statements regarding the murder of Stone, I conclude that this new evidence, considered in conjunction with all of the admissible evidence presented at Jordan's first trial and at the evidentiary hearing, would not probably produce an acquittal at a new trial. Riker is simply not credible in any respect and his statements cannot create a reasonable doubt that Jordan murdered Stone that did not exist at Jordan's first trial particularly in light of Stone's dying declarations that would be

presented to a jury at a new trial.

IT IS THEREFORE ORDERED that Defendant Mark Jordan's Motion for a New Trial Based on Newly Discovered Evidence of Actual innocence [Doc # 658] is DENIED.

Dated: January __28__, 2015, in Denver, Colorado.

BY THE COURT:

   s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE

19